## Pennsylvania Railroad Co. *versus* Weber.

76　　157<br>f 27 SC ³255<br>76　　157<br>213　　³160

1. Weber driving a horse and light wagon over a railroad on the crossing of a county road was killed by a locomotive moving on the railroad. There was no express testimony as to whether he stopped and looked and listened before going on the railroad. *Held*, that the question of his negligence was for the jury.

2. It is the duty of a traveller to stop and look and listen before crossing a railroad ; not so doing is negligence in itself.

3. The presumption in the absence of other evidence is that the traveller stops and looks and listens, before crossing a railroad.

4. In an action against a railroad company for injuring such traveller, the burden is on the defendants to disprove due care, unless the plaintiff's own evi dence shows contributory negligence.

5. Although from the uncontradicted evidence in this case it might have been inferred that if the traveller had stopped and looked and listened he would have seen the approaching train, it was for the jury to determine the fact.

May 15th 1874. Before AGNEW, C. J., SHARSWOOD, WILLIAMS, MERCUR and GORDON, JJ.

[Pennsylvania Railroad Co. *v.* Weber.]

Error to the Court of Common Pleas of *Perry county :* Of May Term 1874, No. 47.

This was an action on the case, brought to January Term 1870 of the court below, by Sarah Ann Weber, widow, and Margaret Weber and others, children of George H. Weber, deceased, against the Pennsylvania Railroad Company. The cause of action, as set out in the declaration, was that the defendants, by carelessness and negligence in running their cars on their road, caused the death of Weber on the 28th of August 1869, at a public crossing by a county road.

The cause had been tried before and a verdict for $2500 rendered for the plaintiffs. On a writ of error, the judgment on this verdict was reversed by the Supreme Court (22 P. F. Smith 27).

The deceased was a baker, living at Duncannon, in Perry county, and carried bread, cakes, &c., for sale, in a one-horse wagon, to Marysville, about six miles east of Duncannon. He went three times a week, and had been doing so for about eighteen months. He travelled on the county road, which is alongside the railroad and crosses it several times between the two towns. On the 28th of August 1868 he was crossing the railroad from the south on the public road, in a "spring wagon" with one horse, the curtains being rolled up, when his wagon was struck by the locomotive of the "Harrisburg Accommodation" train, belonging to the plaintiffs, going east; his horse was killed immediately and himself so badly hurt that he died in a very short time.

The crossing is the third east from Cove station, about a mile and a half from that station and is about 110 feet from the end of a stone wall built on the south side of the railroad; the wall is 1117 feet in length, extending westwardly. Until within 400 feet of the crossing, the county road is below the grade of the railroad; it then ascends a hill, and afterwards descends at a grade of six degrees to a level twenty-five feet from the railroad track, and passes on this level over to the northern side of the railroad. The whistling-post on the railroad was 1230 feet west from the crossing where Weber's wagon was struck. The stone wall on the railroad and the increased noise from the rolling of cars passing between the walls have the effect of drowning the sound of the whistle.

The principal question in the case was as to the contributory negligence of the deceased.

The case was tried the second time, May 6th 1873, before Junkin, P. J.

M. H. Foos, for the plaintiffs, testified that he was a passenger on the train; his attention was arrested, after leaving Cove station, by a sharp whistle and a sudden stoppage of the train about 200 yards east of the crossing; he looked out and saw part of the wagon hanging on the engine; he got out and saw the horse lying

on the north side of the road, and Weber on the pilot under the head-light; he was not then dead, but was dead when the train reached Marysville, about a mile and a half from the crossing. Witness remembered no other whistling just before the accident occurred.

A. Kauffman, who was a laborer for the company, testified that he was working on the road about a quarter of a mile east of the crossing, around a curve, so that he could not see the crossing; he heard one blast of the whistle about the time of the accident, but had not heard any more. He went up to the crossing and found Weber lying on the pilot, dying.

A. Ensminger, also a laborer of defendants, testified that he was working 300 or 400 yards east from the crossing; he saw Weber passing westwardly with his horse and wagon; "after a young man, Alfred Priesler (who was working with witness), had bought cakes from Weber, we started right away to work again. I was working with my face eastward, stooping down, tamping a tie, and I heard a sharp whistle; I turned around and looked up the road, and I saw the engine strike the wagon and horse." Witness did not hear any other whistling about that time; he was busy at work and paid no attention.

P. Deitz, who was working with Ensminger, testified that he saw Weber passing with his wagon westwardly; witness and Priesler bought cakes from him, and they then went back to work; Weber started on; "I heard a whistle; I looked up; says I, 'There goes the baker;' this whistle was at the time the baker was going on; the train and Weber were approaching each other at the time." Witness did not take notice of the train till he looked up, and did not hear any other whistle or warning than the one he had mentioned. "I was frightened lest the Dutch baker should get injured."

D. Rife testified that he had assisted in making measurements at and near the crossing; a person standing on foot in the county road before coming to the crossing, and 21 feet from the south rail of the south track, could see an engine coming 601 feet from the middle of the crossing; at 27 feet the smoke-stack of the engine could be seen 214 feet.

Eli Branyan testified that he was in company with Rife when these measurements were made; that, standing 21 feet from the track, the engine was just one minute coming to the crossing from where the smoke-stack was first seen; and one-half minute when standing at 27 feet from the track; the trains he saw were long freight trains.

J. B. Hackett, a surveyor, testified that from Marysville for the distance of 2 miles 246 rods westwardly, the county road crosses the railroad five times; from the second crossing, where Weber was killed, to the next above is 184 rods.

The plaintiffs gave much other evidence for the purpose of showing that the whistle was not sounded or other warning given before the train approached the crossing ; also that the view of the railroad for a considerable distance was hidden by underbrush and trees growing on the banks of the railroad.

For the defendants, E. B. Taylor, who was a civil engineer in the employ of the defendants, testified that, standing in the middle of the county road, at a distance of 20 feet from the south rail of the south track, that track could be seen at a distance of 210 feet west from the crossing ; the targets on the cross-switches could be seen 1087 feet from the crossing ; at the whistling-post, 1245 feet from the crossing, the head-light of an engine could be seen ; the head-light would be about 10 feet above the rail ; in a wagon, with the horse's head 2 feet from the south rail, an engine could be seen 3911 feet from the crossing ; standing in a wagon on the summit of the county road, 117 feet back from the track at the crossing, the engine could be seen at the whistling-post, and the whistle could be distinctly heard there. The first crossing from Marysville to the crossing where Weber was killed, measuring on the railroad, is 1286 feet ; from the first crossing from Marysville westwardly the road is straight for about 4000 feet. A whistle at Cove station could be heard at the crossing where the accident occurred ; the ringing of a good bell at Cove station could be heard there.

S. H. Free, the engineer of the locomotive by which Weber was killed, testified that the train left Altoona on time in the morning of the day of the accident ; ran its usual and schedule speed (23 7-10ths miles per hour) ; was on time at all the stations. The day was clear ; the machinery was all in good order ; the track good and everything right ; the fireman rang the bell at the two upper crossings after leaving Cove station ; the bell was good ; at the whistling-post above the crossing where Weber was killed, witness blew four blasts of the whistle for that crossing ; "about half way from that to the crossing below I saw the horse coming out on the road towards the track ; I blew the whistle again some four or five blasts, sharp and quick, and a very short time after that the horse and wagon stopped on the track ; as soon as it stopped I pulled on the patent brake and reversed the engine ; the engine was in that position until it struck the wagon." When he first saw the horse's head it was within a few feet of the track. When the engine struck Weber, the horse stood with his hind feet just across the north rail of the south track ; Weber was sitting in the wagon nearer the front than the middle ; he had hold of the lines pulling back, as if he was trying to back his horse ; the front wheels of the wagon stood near the north rail of the south track ; the shafts stood up alongside of the horse's neck.

H. Robinson, the fireman, testified much as the engineer ; also

that he rang the bell at the two upper crossings. He was sweeping the foot-board when the engineer sounded the alarm-whistle; he then looked on his side of the engine and saw the horse; "I then saw a man seated in the wagon, near the middle as near as I could tell by the appearance; the horse was stopped; it appeared to me he was trying to back the horse off the road, as the shafts were up alongside the horse's neck, and the wagon had run on him; he remained in that position until we struck him." The engine had been reversed, the brake applied, and the speed of the engine had been slackened before he was struck.

The defendants gave in evidence photographs of the road, of the ground where the accident occurred, the vicinity, &c., &c. They gave evidence also that the sight of the road was not obstructed by underbrush, and much testimony in answer to the plaintiffs' case generally.

The plaintiffs' second point and the answer were:—

Point: "As the uncontradicted evidence in this case shows that George H. Weber did not stop before arriving on the track, the verdict must be for the defendants."

Answer: "We cannot affirm this point, but say again that the first presumption of law is that he did stop, look and listen. But this presumption will give way to the actual truth, that he did not do so. And we again say, that if the evidence satisfies you that had Weber stopped, looked and listened, he would not have been injured, then he was guilty of negligence, &c.; you should find for the defendants, even should you find that the engineer gave no warning of the approach of this train."

The court charged:— * * *

"First, then, was the death of Weber occasioned by the negligence, carelessness and impropriety of the Pennsylvania Railroad Company? That he was killed in the manner here mentioned there can be no denial or doubt, but whether through the company's negligence or his own is the question. The company, on the day herein designated, were running their engine and cars on their own road, on the proper track of the said road, and at or about the usual time of day. They had the right, beyond all question, to use their road, with their engine and cars, their engineers, conductors and servants, to carry passengers or freight, as they should deem right, subject only to the legal principles which govern and control the exercise of such rights.

"Weber, with his horse and wagon, on the same day and time, was travelling on a common highway, used and occupied indiscriminately by every person whose business or pleasure called him along it. He too had an unquestioned right to use this highway for his own purposes, and at such times as suited his pleasure or convenience, subject, at the same time, to the understood rights of others. The company, with their engines and cars, and the baker.

26 P. F. SMITH—11

[Pennsylvania Railroad Co. *v.* Weber.]

with his horse and wagon, had their respective rights at this cross-ing, of such character that they should not molest or interfere the one with the other.

"These reciprocal rights created corresponding duties. The railroad company, notwithstanding their right to travel along and over their own road, were bound to exercise due care and diligence in the use thereof; and Weber, although on a road whereon he had a right to travel, was also under the obligation of duty so to exercise his right as not to interfere with the rights of others. With these rights and duties respectively they met at the crossing, and the fatal accident occurred. Weber was on the track of the railroad, and the engine and train passed along, breaking up the wagon and horse and killing him. Where was the negligence which occasioned this fatal collision? Was there any on either side? Was it one of those inevitable, unavoidable accidents, regarded in law as the act of God, with no one to blame? In the absence of all proof showing negligence, the law presumes it to be unavoidable—that is, such as no ordinary prudence on the part of both Weber and the company could have guarded against. And this presumption continues to prevail until the proof establishes negligence or carelessness on the part of the company, and the evidence disclosing no negligence or carelessness on the part of Weber, then this balanced condition arising from the presumption that the accident was unavoidable gives way, and the company is shown to be in fault, becomes chargeable with the consequences of its negligence, and the plaintiffs may recover. [But if the evi-dence shows negligence on the part of Weber in approaching and crossing the track of the defendants' road, and no negligence on the part of the company, then the blame and fault would be Weber's own, and the law would not permit these plaintiffs to recover.] And still again, if the evidence shows that both Weber and the company were guilty of negligence or carelessness in crossing the track, so that both parties were to blame for the acci-dent, the plaintiffs cannot recover, because he would then have contributed to the injury himself, and the law never allows a man to gain by his own wrong. * * *

"Then what is negligence? It has been described as the want of that care which men of common sense and common prudence ordinarily exercise in like employments. This is a fair and plain definition of negligence, and it is important that you carry it with you in your examination of the testimony. To determine whether there was negligence on either side, and whether the defendants were negligent, a brief view of the evidence becomes necessary.

"First, then, the accident occurred in open day, without the excuse of darkness. The public road runs close alongside of the railroad; it could run nowhere else, owing to the bluff of the mountain and the Susquehanna river, and in a distance of four

[Pennsylvania Railroad Co. v. Weber.]

miles crosses the track of the railroad five times at least.  Some places it runs  below  the level of  the railroad and  some  places above.   Where this accident occurred the road·(public), just below the crossing, runs above the level of the railroad track about ten and a half feet, and then advancing westward (and that was the direction in which Weber was moving), the road descends at about 6 degrees and comes to the level of the railroad at the crossing, 25 feet before reaching the crossing itself; and after passing the crossing the public road falls below the level of the railroad ; but this is not important, as Weber was killed at the crossing.   Then from this fatal crossing looking westward, at a distance of 1230 feet, stands the whistling-post, and at this post, or in sufficient time, it is the duty of the engineer to sound the whistle.  Then, at 110 feet from this fatal crossing, on the hill-side of the railroad track and on the same side of said track that the county road is on, below or eastward of the crossing, commences a retaining stone wall which runs westward a distance of 1117 feet, and is 7 feet high from the bottom of the ditch, which would make it 6 feet above the rail of the track, and the south rail is 6 feet from this retaining wall.   Then add the fact that the railroad from this crossing westward is so nearly straight that a man standing on the centre of this crossing can see it westward a distance of nearly one mile, and the further fact, if believed, that in July or August 1869, the brush and weeds growing on the slope of the bank were cut back 20 feet from this stone wall, and you have the conditions under which Weber approached this crossing on his way from Marysville to Duncannon on the 28th August 1869, and was killed by a train running at from 15 to 20 miles per hour.  Now let us define for you at this point what precaution and care the law requires at the hands of a traveller when he is approaching a railroad crossing or any dangerous point in the way he is journeying.   In North Pennsylvania Railroad Co. v. Heileman, 13 Wright 60, Hanover Railroad Co. v. Coyle, 5 P. F. Smith 396, and others, it is distinctly announced that ' at the intersection of a railroad with a common road there are concurrent rights, and neither the traveller on the highway nor the company has an exclusive right of passage.'

" 2. As the movement of railroads is necessarily so rapid, and the consequences of collisions so disastrous, it is the duty of the traveller on the highway, to look out, when approaching its intersection with a railroad, for trains and approaching engines, to stop and listen ; and if he fails to take this precaution, he is guilty of negligence, and cannot recover for injuries sustained by a train coming in collision with him.   Precaution, looking out for danger, is therefore a duty.   Not looking for a coming train is not merely an imperfect performance of duty, it is an entire failure of performance, and negligence in itself.   And in Hanover Railroad Co.

*v.* Coyle, 5 P. F. Smith 396, it was wisely held by the Supreme
Court that a peddler approaching a railroad at a point in a town
where he had often crossed muffled in his coat within the covered
top of his wagon, taking no notice of the railroad, and driving
slowly upon the track without stopping or looking out, was guilty
of negligence.

"[Now then, it becomes important for you to inquire, what were
Weber's opportunities to see the train approaching which struck
and destroyed him. Had he stopped, looked and listened, because
if the evidence satisfies you that, if he had stopped, looked and
listened, the accident would have been avoided,—then you cannot
find damages.] Such failure on his part would be negligence, and
there can be no recovery by the plaintiffs. Then what were
Weber's opportunities to see and hear this train? It is an impor-
tant fact, that he was moving westward, while the train was mov-
ing eastward—it was coming *towards* him—and thus his chances
to see and hear were much better than if the train had been ap-
proaching in his rear. The road or ground over which Weber
must necessarily have passed, at a distance of about 110 feet from
the crossing, was undoubtedly some 11 feet above the level of
the railroad bed; his wagon would elevate him still higher; the
slope of the hill-side west of the crossing, along and over which he
must look for the approaching train, was about 9 feet above
the rails of the track, and if John Whitzel is believed, the bushes
along the slope, back of the stone wall, were mowed off in July or
August in same year; and George W. King, John Whitzel and
others, if correct, saw the smoke-stack and engine as low down as
the head-lights from the summit of the high ground aforesaid, over
which, as before observed, Weber must have passed—so far up the
road as the whistling-post—1230 feet from crossing. And it is
further established by actual experiment, that by standing one
foot from the track, and even 20 feet back from it, an engine
was visible as far up as the whistling-post, a distance of over 1200
feet. [Add to this the fact that Weber was accustomed to travel-
ling this road, and then determine whether any ordinarily prudent
man, exercising reasonable watchfulness and care, would have been
able, by stopping, listening and looking, to have seen this train
approaching, and avoided the calamity which befell Weber; *and
if he could*, and you believe that Weber neither stopped, listened
nor looked, but, on the contrary, advanced recklessly and care-
lessly upon this crossing, then, whether the whistle was blown or
sounded by the employees of the company on the train or not, he
(Weber) was clearly guilty of negligence, and these plaintiffs cannot
recover.] In determining this point you will look at all the cir-
cumstances of the case, and if you find that Weber was negligent,
careless and reckless in approaching this crossing, then you need
go no further, but find for the defendants.

[Pennsylvania Railroad Co. v. Weber.]

" It is testified that from top of hill east of crossing, in county road, 117 feet from south rail of south track of railroad, at the fatal crossing, the view of a man standing on this summit reaches westward up the railroad to the curve, a distance of over 3900 feet—to near four-fifths of a mile—over three-fourths of a mile ; then, if Weber, when crossing this hill, and when on its summit, or at any point along the summit, had looked as he in law was bound to do, he could not have failed to see any approaching train for the distance of over three-fourths of a mile in front of him and above the crossing ; and still further, from the summit of this hill, it was only 117 feet down the hill, around the curve of county road, until he would reach the south rail of south track of railroad, and if, when he had passed over 100 feet of this 117 feet, and within twenty feet of the said south rail, and it would only have taken him 17 seconds of time, moving at the rate of four miles per hour, to have gone over these 100 feet, and he had *then* stopped and looked, as in law he was bound to do, he could have seen an engine at the bone factory, or whistling-post, and along from there to crossing, a distance of over 1200 feet.   Now do you believe, under this state of facts, *and the facts are not contradicted*, that any ordinarily prudent man would have failed to see and avoid the calamity which befell Weber ?   Can it be possible that, had he looked, he would have been injured at all ?   You are not at liberty, under the oaths you have taken, to shut your eyes to this proof.   If you believe this, it is binding on you, and you must give the fact full play in determining the issue.   In the midst of vague and loose observations, made by men called as witnesses to prove what can be seen and what cannot be seen from the summit of the hill in the county road, and near it, we turn with sensations of relief to one of the views taken by an artist, with a camera, an artificial but unerring eye, and which is utterly incapable of mis-representing, either by mistake or design, and you will there see that by a view taken on the side of the county road, on summit of hill, east of crossing over which Weber passed, at three feet from the ground, the eye can see up the railroad track as far as the cross switches, a distance of over 1245 feet from the crossing. There can be no mistake about this testimony, and it conclusively establishes the significant fact that this crossing affords advantages to the traveller for looking west in order to observe trains.   Then how can it be truthfully said that this is a dangerous crossing— with its approaches commanding at least 1300 feet of the track itself, and probably a view of trains for over three-fourths of a mile ?   Now, had Weber stopped and looked, as he was bound to do, is it probable that he would have failed to see this train ? This is for you.

" Then, was this view obstructed in 1869 by bushes ?   Several witnesses for the plaintiffs, Mr. White and Mr. Moore, and perhaps

[Pennsylvania Railroad Co. *v.* Weber.]

others whom I do not remember, speak vaguely of bushes, but don't say where they were ; whereas several witnesses, George W. King, John Wheitzel and R. Q. King, prove that these bushes on slope of bank west of crossing have been mowed off year by year for many years, as far back as twenty feet, counting from south rail of south track of railroad, and some of these men say they had this done, and all of them were laboring about this part of the road more or less at the time of the accident. Now, is this evidence more satisfactory than the mere passing observation of men whose business did not call upon them to see and observe ?

"Then, as to the character of the witnesses. The law presumes that all witnesses speak the truth. In actions against railroad companies, it is alleged, their employees generally swear for the road, but it is just as true that others, not employees, generally swear about as vigorously against these companies.

"But if the evidence fails to satisfy you of the carelessness of Weber, then you must go further and inquire whether the company was negligent of its duty. Now, it was the duty of the company through its employees conducting this train, to have sounded the whistle at a reasonable distance above this crossing, and there was a whistling-post 1230 feet from this crossing, and here it was the duty of the engineer to blow. Did he do it ? The evidence on this point is very contradictory. On the side of the defendant we have Samuel H. Free, the engineer, who swears positively that, when about this whistling-post, he blew several blasts. H. Robinson, the fireman, swears to the same thing, and Andrew C. M'Cully, a gentleman of high integrity, who was on board the train, swears that the usual alarm-whistle was blown at the whistling-post. On the other hand, Isaac Ream, Mary Smith, Michael Foose, Adam Kauffman, Frank Von Flie, Henry Gamber, A. W. Ensminger, Perdits, Isaac Baker, Anna Jones, Mrs. E. Smith, William Sayler and Robert J. Shearer,—who seem to have had opportunities of hearing, and who testify that they heard no whistling as a signal at the crossing. As a general rule, affirmative evidence is more reliable than negative, but you will fully consider the strength of this negative proof—looking at the opportunities these negative witnesses had of hearing ; the probabilities of their taking notice of a whistle, and if on the whole, the force of this evidence outweighs the positive, you will act accordingly. You will in this connection, however, consider that, where persons are busily engaged in working, talking or thinking, they often fail to notice the striking of a clock, even in the room in which they may be, and experience teaches us all, that the sound of the locomotive whistle is scarcely noticed by persons accustomed to hearing it, or by persons who are not interested in it at the time. The evidence of the negative or non-hearing witnesses would have to be very satisfactory to my mind, before I could permit it to overthrow the

positive testimony of three witnesses, or even one reliable witness, who swears they or he did hear; but this is a matter for you to pass upon, and to you we submit it.

"Then, should you find that, in point of fact, the whistle, as an alarm for this crossing, was sounded, we see nothing in the case to take it out of the usual rule of law, that where the company operating a road, such as this, has not been guilty of negligence, and there occurs a disaster, it is not responsible. But should you find that the defendant did not blow the alarm-whistle at all, or in such manner as to give sufficient warning, and you should further find that Weber was not guilty of negligence in approaching this crossing, then the defendant is liable, and it will become your duty to assess the damages." * * *

The verdict was for the plaintiff for $4166.66.

The defendants took a writ of error and assigned for error the answer to their second point and the parts of the charge in brackets.

*L. W. Hall* (with whom was *C. I. T. McIntire*), for plaintiffs in error.—The judge having conceded that the facts were not contradicted should have charged that Weber was guilty of negligence. Whether the accident would have been avoided if Weber had stopped, looked and listened, his failure so to do was the nonperformance of a positive duty, precluding the right to recover. The judge so instructed the jury, but destroyed the value of his instruction by the qualification that the evidence must not only satisfy them that he did not stop, look and listen, but that if he had done so the accident would have been avoided; thus leaving the fact of negligence to the jury on an immaterial point: Penna. Railroad *v.* Beale, 23 P. F. Smith 504. Charging that if Weber was negligent and there was no negligence on the part of the company, would allow the jury to find for plaintiff if the company was negligent without regard to his conduct.

*C. A. Barnett* (with whom was *C. H. Smily*), for defendants in error.—The law presumes that Weber did all that was required of him : Lehigh Valley Railroad *v.* Hall, 11 P. F. Smith 361; Penna. Canal Co. *v.* Bentley, 16 Id. 30; Allen *v.* Willard, 7 Id. 374; Cleveland & P. R. R. *v.* Rowan, 16 Id. 393.

Mr. Justice WILLIAMS delivered the opinion of the court, February 1st, 1875.

This case was here on a former writ of error, and was reversed for the admission of irrelevant and improper evidence: 22 P. F. Smith 27. It now comes before us, after a second trial in the court below, for the correction of alleged errors in refusing to charge as requested, and in the instruction given to the jury. The action was brought by the widow and children of George H.

[Pennsylvania Railroad Co. *v.* Weber.]

Weber, who was killed at a public crossing of the defendant's road, by a passing train, to recover damages for his death. It was unquestionably the decedent's duty, as the court below in effect charged the jury, to stop and look and listen for approaching trains, before attempting to cross the track of defendant's road; and if he failed to observe this precaution, his failure was not merely evidence of negligence, it was negligence in itself. But it does not follow that he omitted his duty in this respect, because he was killed by a passing train. Nor was it incumbent on the plaintiffs, in order to recover damages for his death, to show affirmatively that, before attempting to cross the track, he did stop and look and listen. The common-law presumption is, that every one does his duty until the contrary is proved; and, in the absence of all evidence on the subject, the presumption is, that the decedent observed the precautions which the law prescribes, before he attempted to cross the defendants' road. It is true, that when the plaintiff's own evidence discloses contributory negligence, there can be no recovery; but if it does not, the burden is on the defendants to disprove care; and in such case the question of negligence is for the jury. Does, then, the plaintiffs' evidence show that the decedent was guilty of contributory negligence in not stopping to look and listen for the train by which he was killed? If so, the court should have given a binding direction to the jury to find for the defendants. But, in the absence of such evidence, it would have been error for the court to withdraw the case from the jury, and determine, as matter of law, that he was guilty of negligence, which contributed to his death. Whether, then, the court should have affirmed the defendants' second point without qualification, depends upon the character of the evidence of which it was predicated. If, as suggested in the point, the uncontradicted evidence in the case shows that the decedent did not stop before driving on the track, then he omitted a plain and positive duty, and the court should have declared its omission negligence, as a matter of law. But if there was no direct and positive evidence, showing that he did not stop before driving on the track, then the learned judge was clearly right in refusing to withdraw the case from the jury, and in saying, as he did, "We cannot' affirm this point, but say again, that the first presumption of law is, that he did stop, look and listen. But this presumption will give way to the actual truth, that he did not do so. And we say again, that if the evidence satisfies you that had Weber stopped, looked and listened, he would not have been injured, then he was guilty of negligence, and you should find for the defendants, even should you find that the engineer gave no warning of the approach of the train." It is apparent, from the answer and from the whole tenor of the charge, that if the court erred in not giving the instruction prayed for, the error arose from a mistaken view of the evidence, and not from

misapprehension of the law. Does the uncontradicted evidence in the case show that the decedent did not stop before driving on the track ? We have looked through the record and have not been able to discover any direct and positive evidence that such was the fact. The decedent was returning in a baker's wagon from Marysville, where he had been to supply his customers with bread, and was seen by the plaintiffs' witnesses, who were at work on the railroad, about twelve hundred feet east of the crossing where he was killed. He stopped and sold them some cakes, and then drove on. One of the witnesses, Alfred Ensminger, in answer to the question, " What was the next thing that attracted your attention after the baker started on his way westward ?" said : " Well, after a young man had bought the cakes from him, Alfred Priesler, we started right away to work again : I was working with my face eastward, stooping down, tamping a tie, and I heard a sharp whistle ; I turned around and looked up the road, and I saw the engine strike the wagon and horse." The other witness, P. Deitz, said : " I bought some cakes from him, me and Priesler. After the purchase of the cakes, we went back to work again, and he started on." In reply to the question, " Where did you next see him ?" he said : " Well I heard a whistle ; I looked up ; says I, ' *there goes the baker*,' we just call him the baker. This whistle was just as the baker was driving on, as near as I can tell. The train and the baker were approaching each other at that time ; I did not know that the train was coming until I looked up ; I did not hear any but the one whistle. In answer to the question put to him on cross-examination, " Was the horse close to the rail when you saw him ?" he said : " I could not say that positively, because I was scared ; I could not say how close he was ; I could see the horse though." On behalf of the defendants, Samuel H. Free, the engineer of the train, testified as follows : " When we got to the end of the stone wall, or near about there, I believe the whistling-post stands near the end, I blew the whistle four blasts for the next crossing below. About half way from that (the whistling-post) to the crossing below, I saw the horse coming out on the road towards the track ; I blew the whistle again some four or five blasts, sharp and quick ; and a very short time after that the horse and wagon stopped on the track ; as soon as they stopped, I pulled the patent brake, and reversed the engine ; the engine was in that position until it struck the wagon ; I suppose the horse's head was within a few feet of the track when I first saw it ; when I first saw the horse I was about half way from the whistling-post to the crossing, as near as I can tell ; when I struck Weber the horse stood with his hind feet just across the north rail of the south track, as near as I can tell ; Weber was sitting in the wagon, not quite in the middle of the wagon, a little nearer to the front than the middle ; when I got close enough to him, I saw he had hold

[Pennsylvania Railroad Co. *v.* Weber.]

of the lines, pulling back, as though he was trying to back the horse; I think the two front wheels stood near about the north rail of the south track ; the shafts stood the same as a horse backing or trying to back, standing up along side of his neck." Henry Robinson, the fireman, testified : " My attention was called first as I was sweeping off the foot-board, by an alarm-whistle; I looked on my side and saw the horse; I saw a man seated in the wagon near the middle, as near as I could tell by the appearance; the horse was stopped; it appeared to me that he was trying to back the horse off the road, as the shafts were up alongside of the horse's neck, and the wagon had run on him; he remained in that position until we struck him." This is the substance of the testimony on the subject, and so far from showing that the decedent did not stop to look and listen before driving on the track, it shows conclusively that there was no direct and positive evidence on the subject, one way or the other. No human eye saw him from the time he sold the cakes to Deitz and Priesler until the alarm-whistle sounded, when he was seen driving upon the track, his horse's head within a few feet of it, and the engine not more than six hundred and twenty feet from the crossing where the collision took place.

Whether he stopped, or not, before driving on the track, is matter of mere inference or conjecture, and cannot with certainty be known. On the one hand is the presumption that he stopped to look and listen. He was well acquainted with the crossing, having been accustomed to drive over it every day, and must have known the time at which the regular trains passed. He had the highest motive to take the necessary precaution to insure his safety, and the presumption is that he did. On the other hand, it may be inferred from the circumstances, that if he had stopped to look and listen he would have seen or heard the approaching train. But whether he stopped, or not, it was the province of the jury to determine as a question of fact, and not a matter of law, for the decision of the court. The evidence from which the decedent's negligence may be inferred, is not so clear and convincing in this case as in The Hanover Railroad Co. *v.* Coyle, 5 P. F. Smith 396, and The Pennsylvania Railroad Co. *v.* Goodman, 12 Id. 329, in both of which it was held, notwithstanding our dissatisfaction with the verdicts, that the question was rightly left to the jury. Manifestly the court could not have given the instruction prayed for, without invading the province of the jury, and running counter to the whole current of our decisions in cases of negligence. If, then, there was no error in refusing to affirm the defendants' second point, did the court err in saying to the jury in answer to it, that if the evidence satisfies you that had Weber stopped, looked and listened, he would not have been injured, then he was guilty of negligence, and you should find for the defendant. Whether he stopped, or not, was, in the absence of any direct and positive evi-

dence on the subject, a matter of inference from all the circumstances of the case, and what was the reasonable and proper inference was for the determination of the jury. What possible harm then could the instruction complained of do the defendants? On the contrary, what stronger argument could have been made to the jury to show that he did not stop, for if they believed that he would not have been killed if he had stopped to look and listen, then the natural and pregnant inference would be that he did not stop; and if so, he was guilty of contributory negligence, and the plaintiffs were not entitled to recover. Nor was there error in charging that if the evidence shows negligence on the part of Weber in approaching and crossing the track of defendants' road, and no negligence on the part of the company, then the blame and fault would be Weber's own, and the law will not permit the plaintiffs to recover.

This instruction was clearly right, and it could not, as contended, have misled the jury by leading them to believe that they could not find a verdict for the defendants unless they found that the company was not guilty of negligence, although they should find that Weber was, for in the very next breath the court told the jury that if the evidence shows that both Weber and the company were guilty of negligence or carelessness in crossing the track, so that both parties were to blame for the accident, the plaintiffs cannot recover.

The very able and earnest argument of the counsel for the plaintiffs in error has failed to convince us that the evidence in this case shows such contributory negligence on the part of the decedent as made it the duty of the court to declare it such as matter of law, or that there was any error in the instructions given to the jury. On the contrary, we are satisfied, upon a review of the whole record, that the case was well tried by the learned judge, and that his charge contains a clear and correct statement of the law arising upon the evidence. If the jury erred in their finding, it was from no failure on his part, to draw their attention to the true attitude of the case under the evidence, and to that view of it which tended to show contributory negligence on the part of the decedent.

The court could not have gone further, without trenching on the province of the jury, whose duty it was to determine, under all the circumstances of the case, whether or not he was guilty of contributory negligence.

Judgment affirmed.