This suit arose out of an accident between a truck owned by Ville Platte Concrete *Page 664 
Company and being driven by LeRoy O'Connor, who was killed immediately, and a train of the Chicago, Rock Island and Pacific Railway Company, on January 16, 1947 in the community of Turkey Creek, Louisiana. Riding in the truck as a guest was John W. Walker who lived approximately 16 days after the accident. The widow of LeRoy O'Connor and of John W. Walker filed separate suits for damages on account of the death of their husbands, and the Ville Platte Concrete Company filed suit for the value of its truck which was demolished as a result of the accident. The three cases were consolidated for the purpose of trial, but separate judgments were rendered. We will discuss the question of liability as to all three cases in this opinion. The original petitions named the Chicago, Rock Island and Pacific Railway Company as defendants but supplemental petitions were filed and the defendants, Chicago, Rock Island and Pacific Railroad Company were substituted. The defendants filed exceptions of no right or cause of action which were referred to the merits. The defendants also filed pleas of prescription in all suits. Neither the exceptions nor the plea of prescription is urged by defendants on appeal so it is presumed that they have been abandoned. All three of the petitions set forth the same facts alleging that O'Connor, the driver of the truck was free of negligence and that the crew of the train was negligent by failing to give the warning signal by bell or whistle and that they did not, prior to the accident, keep the look-out required of them and that their negligence was the proximate cause of the accident, and, in the alternative, that if it should be found that O'Connor was negligent in driving upon the tracks, then, in that event, the defendants' crewmen did become aware of the perilous situation of the plaintiffs, O'Connor and Walker, in ample time to avoid the accident by the use of due care and reasonable action upon the part of the train crew, thus invoking the last clear chance doctrine. The defendants deny any negligence on the part of the train crew and allege that the sole and proximate cause of the accident was the negligence of the driver of the truck, O'Connor, and that Walker was guilty of contributory negligence in not seeing the approaching train and warning O'Connor thereof.
After trial, there was judgment in favor of the plaintiffs in the following amounts:
Mrs. Marjorie Fontenot, widow of LeRoy O'Connor, $7,985, same being subrogated by preference to the claim of the intervenor, Hartford Accident and Indemnity Company up to the amount of compensation paid and too be paid by intervenor to plaintiff at the rate of $7.80 per week from January 16, 1947 plus $250 funeral expenses and $50 attorney fees;
Judgment in favor of Mrs. Eliza Russell Walker, $5,075;
Judgment in favor of Ville Platte Concrete Company, $1,450 for loss of truck.
Defendants have appealed and the plaintiffs, O'Connor and Walker, have answered the appeal asking that the judgments be amended by increasing the amounts therein to $30,485 and $13,575, respectively.
The preponderance of the testimony establishes the fact that the defendant train, a local freight composed of the engine, coal tender, fifteen cars and a caboose, was travelling north at a speed of approximately 18 miles per hour, and a dump truck loaded with sand, belonging to the Ville Platte Concrete Company and being driven by Leroy O'Connor, and in the truck with him as a guest was John W. Walker, was travelling east at a speed of approximately 12 miles per hour. The accident occurred at about 9 a.m. on January 16, 1947. The weather was cloudy but not foggy or rainy and the visibility was good. Seventy-six feet west of the tracks and 12 feet south of the road there was situated a dwelling house. The testimony in no wise describes the house except that the fireman and brakeman on the locomotive testified that it obstructed the view of the truck until after it had passed the house. The windows of the cab of the truck were both closed and, according to the testimony of the train crew, were soiled but they did not know whether the dirt was on the glasses before the accident or whether it was caused by the sand with which the truck was loaded being dumped out of the truck as the result of the accident. *Page 665 
We do not think there is any question but that the testimony establishes the fact that the driver of the truck and the guest Walker were grossly negligent. The evidence shows that the windows of the truck were closed and the truck did not stop nor did it slow down or even give any indication of stopping or slowing down for the railroad track even though the whistle was blown and the bell rung. There is nothing to even indicate that Walker warned O'Connor. We do not believe that either ever was aware of the train until they were struck. It was established by the testimony that the trains using this particular track did not run on schedule. The guest, Walker, had lived in the immediate neighborhood of the crossing for many years, and aside from the railroad sign which had the usual "Louisiana Law Stop, Look and Listen" painted on it, he, of course, knew that the railroad track was there and should have been and probably was familiar enough with the local conditions to be put on guard that there was a likelihood that a train might be coming. Walker lived some 16 days after the accident. The evidence establishes the fact that Walker was also grossly negligent. It is practically admitted by counsel for the plaintiffs that the driver and guest were both grossly negligent, but they have plead the doctrine of last clear chance and contend that the only serious issue between the appellants and appellees is whether the defendant-appellant had the last clear chance to prevent the accident and the resulting injuries.
Justice Hamiter, when a member of the Second Circuit Court of Appeal, as the organ of that Court, thoroughly reviewed the law as to the doctrine of last clear chance in the case of Eggleston v. Louisiana A. Ry. Co., La. App., 192 So. 774, 779. The Court stated: "Recent jurisprudence of this state relating to the doctrine of the last clear chance or discovered peril is found in Rottman v. Beverly, 183 La. 947, 165 So. 153; Monk v. Crowell Spencer Lumber Co., La. App., 168 So. 360; Hicks v. Texas N. O. Ry. Co., 186 La. 1008, 173 So. 745; Iglesias v. Campbell, La. App., 170 So. 265; Id., La. App., 175 So. 145; Russo v. Texas Pacific Ry. Co., 189 La. 1042,181 So. 485; Jackson v. Cook, 189 La. 860, 181 So. 195; and Clark v. De Beer, La. App., 188 So. 517. The rule furnished by those authorities is that where a person negligently places himself in a perilous situation and his negligence and peril are actually discovered by the operator of the offending vehicle, or by the use of reasonable care should and could have been discovered, there is then a duty on the part of the operator to save that person from the consequences of the negligent act, if, by the exercise of due diligence, such can be done. If said operator, after the actual or constructive discovery of the existing peril, could have prevented the occurrence of an accident by the exercise of due diligence and failed to do so, such failure constitutes negligence and is considered the proximate and immediate cause of the accident and resulting injury, and the person's negligence the remote cause; and said person may recover, although his negligence continued to the moment of the accident."
It would therefore be well to consider the instant case in the light of the stated law.
The evidence is to the effect that the engineer of the locomotive was on the right or east side of the cab and, therefore, never saw the truck until after the accident. On the left or west side of the cab was the fireman, Myrick, and "sitting on the leg of the tank which is between the cab and the water tank right back of the fireman" was the brakeman, Barnard. Therefore, as the truck was approaching from the west, it could clearly have been seen by Myrick and Barnard. According to the testimony of Myrick, he first saw the truck when the locomotive was from five to seven car lengths from the crossing, each car length being about fifty feet, or a distance of 250 to 350 feet. He testified that the truck continued on its way and that while he thought it would stop, it gave no sign or indication whatsoever of doing so and that when the locomotive was approximately 150 feet from the crossing and it became apparent to him that the truck would not stop, he "hollered" to the engineer to stop the train. *Page 666 
The Brakeman, Barnard, testified on direct examination that the truck was approximately 38 feet from the crossing when he and the fireman Myrick both "hollered" to the engineer to stop the train, as they realized at that time that the truck was going to continue on to the track, and at this time the locomotive was approximately 125 feet from the crossing but that "when we hollered the engineer was right up to the crossing. When he applied the brakes it went on just a second or two before they hit." On re-direct examination, this same witness again testified that when he told the engineer to stop that the truck was approximately 38 feet from the track but he varied his testimony somewhat by stating that the engine of the train at the time that the truck was 38 feet from the track was four or five car lengths from the intersection or crossing, which would be 200 or 250 feet.
The testimony of the engineer, E. H. Mercott, as to when he applied the brakes, being most important to a correct decision in this case, we therefore quote:
"Q. Was it the regular crossing whistle? A. Yes, I applied the brakes. I felt a jar and stuck my hear out. I knew it was coming from the left side.
"Q. You didn't see the truck? A. I could not see it.
"Q. Why? A. Because the boiler was between me and the truck.
"Q. You have to rely on the man on the left to see on the left side? A. Yes.
"Q. Were your brakes in good condition? A. Yes. They had to be to stop fifteen (15) cars, the caboose and engine in that length.
"Q. How far did you drag the truck? A. We got a tape and measured one hundred and forty-six (146) feet from where I hit the truck to where it stopped. We measured from the middle of the track to where the building is and there is a seventy-six (76) foot clearance."
* * * * * *
"Q. You say on this particular occasion the brake caught immediately when you pulled the brake valve? A. Yes.
"Q. As you reached for the brake you felt the jar? A. Yes.
"Q. Since you were on the right side you did not see anything until the train hit the truck? A. No.
"Q. Did the brakes make a screeching sound when applied? A. They took hold but I do not know if they screeched. I made a good stop in one hundred and forty-six (146) feet. That is a good stop.
"Q. You consider a stop in one hundred and forty-six (146) feet a good stop? A. Yes."
There is no dispute as to this distance given by the engineer of 146 feet from the railroad crossing to where the locomotive stopped.
Elmer Newsom, who was an eye witness to the accident, testified that the truck was struck by the drawbar of the locomomotive on its gas tank which is located under the seat of the cab. This drawbar is in the center of the locomotive about 3 1/2 or 4 feet from the ground. This witness testified that he heard the brakes being applied "a second" before the locomotive struck the truck.
Elbert Carpenter was also an eye witness to this accident as he lived about 52 feet from the railroad crossing where the accident happened. He said that he saw the train when it struck the truck and that it made no attempt to slow down until the collision, and he testified that he heard the brakes applied after the train struck the truck. He fixes the distance that the brakes were applied after it struck the truck at 15 feet.
There is some testimony in the record by Geraldine McDaniel, who was approximately nine years of age on the date of the accident and ten on the date of the trial, to the effect that the brakeman and fireman were waving to her and her little brother just before the collision and kept on waving until the train struck the truck. This is denied by the trainmen and we believe there is sufficient positive testimony upon which to base the judgment without considering this testimony.
Mrs. Leslie Foreman was another eye witness who testified that she saw the accident and at the time was standing in her door and that she did not know whether the train slowed down before it struck the *Page 667 
truck but that "after the train hit the truck I heard the wheels screeching."
Mrs. Velma Causey, witness for the defendant, who lived about 75 or 100 feet west of the railroad track and about 350 or 400 feet from the crossing, testified that on this date she was on the south side of her house and heard the train coming and the whistle blowing. She then stated, "I heard my children start to cry. I heard a hissing sound and the bell ring. I looked when I heard the hissing sound and just as I looked I saw the train hit the truck. It pushed the truck ahead of it for a distance."
Another witness for the defendant, Miss Virgie Causey, 16 years of age, who was the daughter of Mrs. Velma Causey, testified that she saw the accident and that she heard the hissing sound before the train hit the truck, but her testimony shows that she realized that the truck was not going to stop and that, therefore, there was going to be an accident.
The fireman and the brakeman both testified that it was their duty to keep a lookout as well as the engineer. There is no reason why the fireman and brakeman should not have discovered the negligence and peril of the occupants of the truck in time to have avoided the accident. The testimony as above quoted convinces us that they realized the negligence and peril of the occupants of the truck when the locomotive was at least 150 feet from the crossing, and at that moment "hollered" to the engineer to stop the train. A careful reading of the engineer's testimony will fail to reveal that he testified he ever heard the warning given at 150 feet. Be this as it may, it was the duty of the fireman and brakeman to warn the engineer in such a manner and method that he would be certain to hear such warning. From the testimony, we are of the opinion that the engineer did not apply the brakes until after the moment of impact as he so testified, or at least until within a few feet of the truck, although a warning had been given at a distance of approximately 150 feet. The brakeman Barnard at one time in his testimony stated that the locomotive was within 125 feet of the crossing at the time of the warning. Even if we take this distance, under the testimony in this case we are still of the opinion that had the engineer applied his brakes at that point this accident would have been prevented, for the train would have been slowed down sufficiently by application of the brakes for the truck to cross the track as it only needed the distance of the dump body. Clearly, from the testimony the train could and was stopped within 146 feet from the time the brakes were applied, and had they been applied at 150 or 125 feet there would have been no accident.
We are therefore of the opinion that the defendant railroad is liable, as the negligence and peril, of the occupants of the truck were discovered by the train crew in time to have prevented the accident and that they failed to prevent the accident, that is, they had the last clear chance.
LeRoy O'Connor was 18 years old and his wife was the same age and they had no children, and she had remarried at the date of the trial, June 18, 1948, which was within one year and five months after the accident. The record does not show the exact date of her remarriage. However it would seem that her grief was, therefore, short-lived and the deep attachment usually formed between those who have been married longer is not reflected by the evidence. O'Connor was earning approximately $24 per week or $1,248 per year and it would therefore appear to us that the judgment of $1,500 for loss of earning capacity, support and maintenance was correct. The item of $485 for funeral expenses is undisputed. As to the judgment for $6,000 for mental anguish, grief, loss of love, affection and companionship, under the scant evidence, we believe, should be reduced to $2,500.
It is, therefore, ordered, adjudged and decreed that there be judgment in favor of Mrs. Marjorie Fontenot O'Connor and against Chicago, Rock Island Pacific Railroad Company in the full sum of $4,485 with legal interest from date of judicial demand, defendants to pay all costs.
It is further ordered that this award be and the same is hereby subrogated by preference to the claim of intervenor, Hartford *Page 668 
Accident and Indemnity Company up to the amount of compensation paid and to be paid by intervenor to Mrs. Marjorie Fontenot O'Connor at the rate of $7.80 per week from January 16, 1947, plus $250 funeral expenses and $50 attorneys fees for Paul C. Reed, attorney-at-law.
As thus amended the judgment is affirmed.