122 So.2d 845 (1960)
Patsy Lee Kelly McFARLAND et al.
v.
ILLINOIS CENTRAL RAILROAD COMPANY.
No. 5076.
Court of Appeal of Louisiana, First Circuit.
June 29, 1960.
Rehearing Denied September 23, 1960.
*846 Breazeale, Sachse & Wilson, Baton Rouge, Carroll Buck, Amite, for appellants.
Sanders, Miller, Downing, Rubin & Kean, J. Nolan Singletary, Baton Rouge, for appellee.
Before ELLIS, LOTTINGER and LANDRY, JJ.
LANDRY, Judge ad hoc.
On August 15, 1958, at approximately 10:30 A. M., Paul E. McFarland, Sr., received fatal injuries (from which death resulted approximately one hour thereafter) when a milk truck he was driving in the course of his employment by Louisiana Creamery, Inc., collided with a freight train operated by employees of defendant Illinois Central Railroad Company at the Centerville Street grade crossing of said defendant's railway in the Town of Denham Springs, Louisiana.
*847 Plaintiff, Mrs. Patsy Lee Kelly McFarland, widow of decedent, brings this action against defendant railroad company in her own behalf as well as for the use and benefit of her minor children, Paul E. McFarland, Jr. and Terry Lee McFarland, issue of her marriage to decedent, to recover damages for pain and suffering endured by decedent, loss of support, love and affection sustained by plaintiffs as a result of said decedent's death, and, funeral and medical expenses incurred by Mrs. McFarland as a result of the fatal accident which befell decedent.
National Surety Corporation (in the capacity as compensation insurer of decedent's employer Louisiana Creamery, Inc.) intervened in the proceedings below averring it had paid plaintiff Patsy Lee Kelly McFarland workmen's compensation benefits at the rate of $35 per week for a period of 35 weeks through April 16, 1959, or the sum of $1,225, plus funeral and medical expense in the sum of $676.50 which aggregate amount it is entitled to recover from defendant railway company in the event of plaintiffs' recovery herein. Said intervenor further set forth that under the workmen's compensation laws of this state it is liable to plaintiffs for compensation at the rate of $35 per week for an additional period of 365 weeks, or the further sum of $12,775 and is entitled to subrogation against defendant railway company in the total sum of $14,676.50, said amount being the total extent of intervenor's liability to plaintiffs under the compensation laws of our state.
Trial of this cause before a jury in the court below resulted in a verdict in plaintiff's favor pursuant to which judgment was rendered in favor of petitioner Mrs. Patsy Lee Kelly McFarland in the sum of $15,000, individually, and in her favor for the use and benefit of her two aforesaid minor children in the sum of $20,000.00 each. Judgment was also rendered in favor of Intervenor, National Surety Corporation in the sum of $2,881.50 (apparently compensation accrued to date of judgment) and for future compensation payments made by said intervenor, said payments to be made in the proportion of ½ by plaintiff Patsy Lee Kelly McFarland and ¼ each by the minors Paul E. McFarland, Jr., and Terry Lee McFarland. From this judgment defendant has taken this appeal. Plaintiffs have answered the appeal suggesting the quantum allotted is inadequate and should be increased.
In order that the contentions of the adverse parties may be more readily comprehended, we deem it advisable to set forth, at this point, certain admitted facts and circumstances attending the crossing at which the accident in question occurred.
Centerville Street in Denham Springs is a black topped two lane thoroughfare running in a northwesterly-southeasterly direction. For all practical purposes it may be said defendant's railroad runs from east to west. The angle at which the street intersects the railroad right of way is very sharp. The tracks are somewhat higher than the general elevation of the street which is, therefore, inclined on each side of the tracks so that vehicular travel is afforded a smooth ascent to track level and an even descent therefrom. The crossing is in a state of good repair quoad the surface of the roadway and tracks. On the west side of Centerville Street approximately 75 feet north of the railroad right of way is the usual "Louisiana Law Stop" sign plainly visible to motorists proceeding southerly along said street. Approximately 450 feet north of the intersection is the customary small yellow Louisiana Highway Department sign with a black "X" thereon indicating the presence of a railroad crossing ahead. The above mentioned signs were the only facilities by which motorists were made aware of the crossing. There were no audible or visible automatic cautioning devices such as flashing lights or ringing bells. Neither was there any contrivance by means of which self-operated barriers or gates would function to bar the crossing to vehicular traffic upon the approach of defendant's trains. *848 Although the crossing was within the municipal limits of Denham Springs it was not situated in a heavily congested area. There were, however, some commercial and industrial concerns in the general vicinity included among which is a large veneer mill situated approximately 600 feet north of the crossing on the east side of Centerville Street. Approximately 400-500 feet east of the crossing a spur or sidetrack branches off from the main line of the railway and runs to the veneer mill for the purpose of providing rail facilities directly to said industry. On the night previous to the accident, the crew operating the train which struck decedent's truck had "cut out" or "spotted" a box car on the spur immediately adjacent to the main line approximately 400 feet east of the Centerville Street crossing. At the time of the accident the mill was in operation and admittedly made some noise. To the south of the mill on the east side of Centerville Street between the mill and defendants' tracks was situated a "slab pit" in which refuse from the mill was burned during the day. This slab pit admittedly emitted some smoke, the amount thereof being a matter in dispute between the parties. For a period of one month or longer Centerville Street had been used as a principal thoroughfare because of the closing of other traffic arteries within the municipality for repairs. The nearest crossing east of Centerville Street was Hatchell Street, the former crossing being approximately 600 feet east of the latter. On the southwest side of the crossing approximately 150-200 feet distant therefrom is situated a grocery store.
Plaintiffs contend the accident was caused solely by the negligence of the train crew. More specifically, plaintiffs charge defendant's employees were negligent in failing to construct the crossing in a safe manner, failing to provide special warning signals, failing to blow the whistle and sound the bell on the train when the train reached a point 300 yards from the crossing until the crossing was passed as required by law, failing to give proper signal or warning where the approach of the train could not be heard because of noise emanating from a nearby industrial installation of which defendant's employees were or should have been aware, operating the train at excessive speed within an incorporated municipality, failing to maintain a proper lookout, failure to keep the train under proper control, placing a box car on a siding to the east of the intersection (the direction from which the train was approaching) in such manner as to obstruct and impede a southbound motorist's view of a westbound train and permitting weeds, trees, grass and brush to grow upon defendant's right of way near the crossing to such height as to completely obstruct the tracks and approaching train from the view of a southbound motorist until such motorist reached a point between the rails of defendant's tracks. The petition further recites that, to the knowledge of defendant's employees, Centerville Street had been a heavily traveled thoroughfare for some time preceding the accident because of the closure of other streets due to repair and reconstruction projects then under way in Denham Springs. Plaintiffs further allege that despite Centerville Street having become a heavily traveled street for the reasons stated, defendant, nevertheless, permitted the aforesaid dangerous condition to persist thereby creating a dangerous trap for unwary motorists using same. In the alternative, plaintiffs plead last clear chance.
Defendant's answer admits the occurrence of the accident but denies its cause may be attributed to any act of negligence on the part of its employees. In its answer defendant alleges its train approached the crossing with the whistle blowing and the bell sounding as required by law and when the engine reached a point approximately 75 feet east of the crossing the engineer first noted the approach of decedent's truck from the north. Defendant next asserts that when the train was approximately 50 feet from the crossing the engineer realized *849 decedent would not stop but would attempt to cross ahead of the approaching train and at that time he placed the train in an emergency stop but there was then no possible way in which the engineer could avoid the collision. Defendant specifically denies the crossing was dangerous in any respect whatsoever or that it constituted a dangerous trap as contended by plaintiff. Additionally, defendant avers the accident was due solely to the negligence of decedent in failing to keep a proper lookout, failing to stop in obedience to the proper warning signs placed along the highway in accordance with law, attempting to cross the track without looking and failing to see and hear the approach of defendant's train which was giving all sound warning required by statute. Alternatively, defendant pleads contributory negligence on the part of decedent in bar of plaintiff's claims.
Needless to say there is considerable variance between the testimony adduced by the contesting parties with respect to the events immediately preceding the collision.
Joe Elzey Minton, (newspaperman) called on behalf of plaintiffs, testified that on the day of the accident he took numerous pictures of the scene of the tragedy. He was questioned with particular reference to a photograph introduced in evidence and marked P-1 for identification, which picture was taken from the west side of Centerville Street approximately 40 feet north of the tracks (said point being between the "Louisiana Law Stop" sign and the tracks). The picture (an enlargement of a smaller photo) graphically illustrates that from that point a motorist traveling southerly could not see the approach of a westbound train because of the presence of a profuse growth of trees and bushes to his left. Plaintiff contends the picture is an accurate reproduction of the terrain as it existed on the date of the accident, whereas, defendant contends the trees and brush shown therein are not on defendant's right of way but upon adjacent privately owned property over which defendant has no control. Minton freely admitted taking numerous pictures but denied the implication of defendant's counsel that he had taken but had failed to produce other photographs which would have shown the crossing in a light more favorable to defendant.
Ivy McDonald, an employee of the veneer mill, who testified as plaintiff's witness, stated he was standing outside the plant some 400 or 500 feet from the crossing talking to some employees after finishing scaling a load of logs on a truck. As the truck drove away, despite the noise of the mill, he heard the train whistle and knowing that the truck which had just departed was traveling toward the Centerville Street crossing, he climbed upon a stack of lumber to see if the truck was in any danger. When he looked he did not see the log truck but did observe decedent's southbound milk truck drive to within a short distance of the track and stop. He stated that after stopping, the truck started forward and was struck by the train. McDonald estimated the speed of the train at 35 to 40 miles per hour. His testimony clearly indicated he considered the crossing dangerous and was apprehensive every time he had to negotiate the intersection which he was required to do several times each day. According to McDonald about two or three weeks preceding the accident, a railroad crew had cut the weeds on the right of way commencing at the crossing and extending 25 or 30 feet back therefrom in each direction. His testimony further shows he heard the train whistle when the train was in the vicinity of the Hatchell Street crossing and that the whistle sounded continuously.
Plaintiff's next witness, Earl Myers, stated he was driving southerly along Centerville Street behind decedent McFarland and although he did not see the impact he came upon the scene while the truck was still "rocking" and its wheels yet spinning. According to Myers, the train had not yet come to a stop and was still moving along "pretty good" although its *850 brakes had been applied. Myers also testified that when the train came to a stop, the engine was way down the track out of sight. He heard the whistle sound only once or twice immediately preceding the impact but noted that it sounded continuously thereafter. He believed the train was still going 40 to 50 miles per hour when he observed it with its brakes in operation. He personally examined the scene and noted that, because of the high weeds and brush and the box car on the siding, visibility to the left or east was very poor. He also stated he tested the view and found that he could not see very far to the east until he stood between the rails themselves. When confronted upon cross examination with a prior statement in which he allegedly related that the train was proceeding about 10 to 12 miles per hour, he denied having then attributed such a slow speed to the train and steadfastly contended in his opinion, the train was going "pretty fast" which he estimated to be approximately 40 miles per hour. He also testified that an individual who identified himself as the train conductor stated in response to a question propounded by the witness that the train was going fast because it was four or five hours behind schedule.
Dr. James Pearce, Veterinarian, plaintiff's witness, stated he was outside his office situated at 971 Centerville Street (on the east side of the street south of the crossing) and first observed the train when it was west of Hatchell Street. He estimated the speed of the train at 50 miles per hour and did not hear its whistle blowing. His attention was attracted to the train because it was an unusual time for a train to be passing. He was not aware of the accident until after its occurrence but upon entering his office remarked to his secretary, Mrs. Gertrude Mitchell, that the train was traveling too fast. Upon hearing of the accident, he went to the scene and attempted to render first aid to decedent who was obviously seriously hurt and in great pain. He further stated that on the way to the hospital it was necessary to forcibly hold decedent in order to administer oxygen to him. Dr. Pearce did not pay any attention to the condition of the crossing with respect to the presence of weeds or brush which might obstruct view.
Mrs. Gertrude Mitchell, who testified on behalf of plaintiffs, stated she was looking out of the window of Dr. Pearce's office and was attracted to the train because it was passing at an unexpected time. She first saw the train when it was approximately halfway between Hatchell Street and the Centerville Street crossing at which time she observed that a man in the cab was pulling on the whistle cord. She did not see the impact but testified that in her opinion, the train was "flying".
Plaintiff's next witness, John Gilbert Ballard, testified decedent McFarland was his immediate superior. On the day of the accident, decedent was substituting for the witness who had the day off. About noon of the day of the accident, Ballard visited the scene of the mishap and observed the weeds were badly trampled but saw no evidence of recent cutting. He closely examined the crossing and found that in order to see down the right of way, a motorist was required to get almost upon the tracks. He particularly noted the presence of the box car on the veneer mill spur. His examination also disclosed that the position of the box car was such as to obscure all vision of the track to the east thereof and to see beyond the position of the box car a motorist would have to be on the track at the crossing. He also testified decedent substituted for him one day in alternate weeks.
Cecil O. Burlingame, called on behalf of plaintiffs, testified he operated a grocery store situated approximately 125 feet south of the crossing and to the west of Centerville Street. He was thoroughly familiar with the crossing, traversing same as frequently as two or three times daily. He was standing behind his establishment and heard the impact of the crash. He looked up and saw the truck going over the top of *851 the train. Prior to the impact, he was not aware of the approaching train and did not hear its whistle. He estimated the speed of the train at 40 miles per hour. For some time prior to the accident he was cognizant of the fact that defendant's right of way was grown up with weeds to the extent view was obstructed and almost blocked. He testified that the right of way was not cut or cleared prior to the accident but about two weeks thereafter. According to Burlingame the growth started next to the gravel near the ends of the rail ties and not far from that point got "real high". He testified the growth extended along the north side of defendant's right of way from Hatchell Street to the Centerville Street crossing and consisted of weeds, willows and scrub cypress. From personal observation he determined that a motorist approaching the crossing from the north would have to go upon the tracks to see any appreciable distance in either direction.
Plaintiffs' witness, Tynes D. Fletcher, an acquaintance of decedent, testified that the day following the accident, while taking his dog to Dr. Pearce's office for treatment, he visited the scene of the accident and noted the presence of weeds, willows and briers within the right of way adjacent to the tracks. Upon examination of the crossing, he found that because of the growth mentioned he had to get within five or six feet of the tracks in order to get a good view down the right of way. Several days following his visit to the crossing he noticed that the weeds and briers had been cut.
Harvey Childers, testifying on behalf of plaintiffs, stated that he was proceeding southerly along Centerville Street approximately 60 to 75 feet ahead of McFarland's truck. After stopping close to the track he crossed immediately in front of the train without having either seen or heard it. Upon crossing the track he heard the train blow and, looking back, for the first time saw the train just as it struck the truck. He considered the crossing dangerous because of the underbrush and weeds present.
Walter Backes, testifying on behalf of defendant stated he is a railroad engineer but at the time of the accident was acting as fireman on the train in question because there were then no openings for engineers with his seniority. He was seated in the fireman's position on the left (south) side of the westbound engine. The engineer began blowing for the Hatchell Street crossing and blew continuously until the moment of impact. He stated the train was proceeding at a speed of 30 miles per hour during the entire run which was the limit set by company rules. He was positive the train did not reduce its speed on entering the municipality but that it continued at its normal speed of thirty miles per hour. He did not see the truck and when the engineer placed the train in emergency he was then unaware of the reason therefor. He considered that the engineer made a good stop under the circumstances.
Weldon H. Yates, brakeman, on the train, stated he was seated on the left side of the engine in a seat behind that occupied by the fireman Backes. The engineer commenced blowing the whistle and sounding the bell before reaching Hatchell Street. He estimated the speed of the train at about 25 miles per hour. Like Backes, he did not see the truck and did not know the reason for the emergency stop until after the accident.
Defendant's next witness, Floyd Hess, a brakeman serving as flagman at the time of the collision, stated he was stationed in the middle of the engine on an improvised seat. Because of his location he could not see the truck. He estimated the speed of the train at 30 miles per hour and stated the whistle was blowing and the bell ringing at the moment of impact.
James C. Burk, conductor on the train testified the train left Baton Rouge, Louisiana, at approximately 11:40 P. M. the previous night to proceed to Hammond and other points. During the outgoing run, the box car near the Centerville Street crossing had been spotted by his crew as a service *852 to the veneer mill. After completing their duties in Hammond and other points in that general vicinity, the train was in the process of returning to Baton Rouge. He stated that there was no fixed schedule for this particular train and there was no set time for its return to Baton Rouge. According to Burk, it was not unusual or uncommon for such trips to take as long as 12 to 16 hours. At the time of the accident he was stationed in the caboose working on required reports. From years of experience in riding on trains he expressed the opinion the train was proceeding at a rate of about 30 miles per hour. He, of course, did not see the truck until after the accident.
Philip Ellsworth, testifying on behalf of defendant, stated he was standing up on the bed of a truck which had just come from the veneer mill. The truck was parked approximately 500 feet from the crossing and he and a co-employee were in the act of loading wood thereon. From the aforementioned position he saw the train at or near the Hatchell Street crossing at which time the truck was approximately 300 feet from the track. He stated that decedent did not stop but continued on and ran into the train. The testimony of Ellsworth was corroborated somewhat by that of Ernest Erp Boby who testified he was standing on the ground assisting Ellsworth load the truck on which the latter was standing. He heard the train blowing before the accident and although he did not see the accident, he recalled hearing Ellsworth state he, Ellsworth, believed the train would strike the truck.
Luther Edwards, engineer, testified the train had been proceeding at a speed of 30 miles per hour on the entire trip and that he did not reduce speed upon entering Denham Springs. However, because he was scheduled to stop in Denham Springs on the return trip, he intended to commence reducing his speed after passing the Centerville Street crossing. He was positive of his speed because he was constantly consulting the speedometer situated on the instrument panel directly within his view. Before reaching the Hatchell Street crossing he commenced blowing the whistle and sounding the bell and continued to give both means of warning as he approached Centerville Street. Upon reaching a point about 75 feet from the Centerville Street crossing, he first observed the approach of decedent's truck. He could not see the truck prior to this time because of the angle of the street and the presence of growing brush and trees. It is only fair to state, however, he contended the obstructions mentioned were not within defendant's right of way but on private property adjacent thereto. When his engine reached a point approximately 50 to 60 feet from the crossing, he realized the approaching truck would not stop and immediately placed the train in an emergency stop but it was then too late to avoid the collision. According to his testimony (as well as that of other witnesses for defendant) the train traveled 18 car lengths after application of the brakes, an average car length being 39 feet.
James A. Fowlkes, section foreman for defendant railway company, testified he lived in Denham Springs. On the Wednesday preceding the accident, utilizing a section crew of four laborers, he had cut the right of way in question from the center line of the tracks extending outward a distance of fifty feet on each side thereof. He stated that the willows and brush referred to by plaintiffs' witnesses are not situated on defendant's right of way. At the time of cutting prior to the accident he cleared the right of way a distance of only 100 feet back from Centerville Street in accordance with orders previously received. After the accident he cleared the entire right of way between Hatchell Street and Centerville Street which method of cutting was different from that theretofore employed.
Robert I. Forte, Electrical Engineer and consultant employed by defendant, after being furnished information regarding the composition and weight of the train in question stated that a train thus assembled traveling at 30 miles per hour should be able *853 to make an emergency stop within a distance of approximately 900 feet.
Despite all the averments of negligence contained in plaintiffs' petition, it is, nevertheless, accurate to state plaintiffs' principal reliance is upon the allegation of excessive speed and the contention the crossing constituted a dangerous trap to motorists because of defendant's failure to cut the weeds, trees and brush within its right of way thereby rendering it impossible for a southbound motorist to detect the approach of a westbound train until the motorist was in a position of danger upon the tracks. In this connection, plaintiffs argue that decedent's failure to stop, look and listen as required by law (if such failure be established in the record) was immaterial under the facts and circumstances shown herein. On this issue, plaintiffs further maintain that had decedent stopped such conduct would have been a useless gesture because, assuming he stopped at any point north of the crossing, he could not have observed the approach of defendant's train because of the obstruction of his view resulting from the growth of weeds, trees and shrubs shown to have existed at the time. On the other hand, defendant argues the record shows decedent did not stop in obedience to state statute, that his view was not obstructed or impeded as contended by plaintiffs, that the train was giving all audible signals required by law, that the evidence shows its right of way was free of obstruction and that if such obstruction did exist it was upon adjacent privately owned premises over which defendant had no control and no right, duty or obligation with respect to maintenance thereof.
In support of defendant's contention learned counsel for defendant has cited numerous authorities relied upon as establishing freedom from fault on the part of defendant's employees under the circumstances shown herein. Additionally, esteemed counsel has cited innumerable decisions in which recovery of an individual has been barred because of contributory negligence resulting from failure to stop, look and listen prior to negotiating a railroad crossing. We have read many of the cited cases and have no quarrel with the results reached in view of the circumstances in each individual case. It is fundamental that the question of negligence of a particular defendant (as well as contributory negligence of a given plaintiff) is purely a question of fact to be determined in the light of the circumstances of each individual case.
The "dangerous trap doctrine" principally relied upon by plaintiffs herein is clearly set forth in American Jurisprudence Volume 44, Verbo Railroads § 507, page 747, as follows:
The principle that if a crossing is unusually dangerous, ordinary care requires the railroad company to meet the peril with unusual precautions, is particularly applicable where the dangerous condition results from obstructions to the view which prevent a traveler from seeing an approaching train until he is dangerously close to the track. In such a case, the railroad company has the duty of exercising caution commensurate with the situation to avoid collisions with travelers on the highway, as by a less amount of speed, or by increased warnings, or otherwise, or, if an unslackened speed is desirable, by keeping a watchman on duty, or some other sufficient means of warning travelers, such as gates or other safety devices. Thus, to pass over a busy crossing at a high rate of speed without giving signals, where the view of approaching trains is obstructed, has been held to be negligence per se. On the other hand, the giving of the signals required by statute at crossings does not exhaust the duty of the railroad company at such a crossing. This rule of care applies notwithstanding the obstructions to the view are legitimate and necessary in the conduct of the business of the railroad company. This rule is fair to the traveler and imposes no injustice upon the railroad company, because it is always *854 within the power of the company to remove the source of danger which its own inattention has created. It has been held, however, that the mere obstruction of the view is insufficient to necessitate the slacking of speed where nothing obstructs the sound of the whistle.
"The question really is as to what is due care where the view of the tracks is obstructed, and it is usually left to to the jury to say whether, in view of the obstructions, the company has exercised ordinary care in respect to the peculiarly dangerous condition of the crossing; whether ordinarily prudent men would have taken extra precautions; and whether such precautions were taken in the particular case. Obstructions of the view of approaching trains does not necessarily necessitate unusual precautions, such as stationing flagmen, where the danger is not great, as where the crossing is upon an unfrequented road."
On the issue of the burden of care imposed upon railroads because of the presence of obstructions upon the railroad right of way, the following appearing in 74 C.J.S. Railroads § 722, pp. 1331-1332 is deemed particularly appropriate:
"Unnecessary obstructions. According to some cases, it is actionable negligence on the part of a railroad company to permit unnecessary obstructions on its right of way at or near a railroad crossing so as to obstruct the view thereat either of its servants approaching on a train or of persons on the highway, as where it allows the right of way to become overgrown with trees, bushes, weeds, grass, etc., so as to obstruct such view. However, in other cases the view is taken that the mere maintenance of an unnecessary obstruction to the view of persons approaching the crossing does not in itself constitute actionable negligence in the absence of a statute requiring railroad companies to keep their rights of way free from such obstructions. Under some statutes a railroad is required to clear its right of way of trees and shrubs for a specified distance on either side of a crossing, and if it is derelict in performing such duty, and such dereliction is the proximate cause of injury, the railroad company is liable. Violation of a statute requiring railroads to keep their rights of way clear of brush or trees for a specified distance does not give rise to a cause of action unless the interest invaded is one which the enactment was intended to protect; and such interest, it has been held, is that of the travelers on an intersecting highway.
"While it has been held that the mere fact that there exist trees, brush, weeds, and the like which might obstruct a traveler's view of an approaching train is not of itself enough to charge the railroad company with the duty of adopting extraordinary safeguards at the crossing, the view generally taken is that the railroad company must operate its trains with reference to unnecessary obstructions, and, if necessary to protect the traveler, must use precautions in addition to those ordinarily used; and, in any event, the maintenance of such obstruction may be considered with other circumstances in determining whether the company exercised due care."
Counsel for plaintiff's contends the death trap principle or theory has been recognized and applied by the courts of this state on previous occasions.
In Downing v. Morgan's L. & T. Railway & S. S. Company, 104 La. 508, 29 So. 207, 212, which involved an accident wherein a decedent was killed by a backing train in the Town of Berwick at a crossing rendered unusually dangerous by certain conditions shown, it was stated:
"It will not do to say that the bell was constantly rung from the time of *855 entering the first switch; that this was sufficient, and that, if Downing did not hear it, it was simply his misfortune and that of his family; that the trainmen had nothing to do with the train on the main line. It is a mistake to suppose that by pursuing the regulation method of giving notice by the ringing of a bell, or following out any particular prescribed mode of giving warnings, parties in charge of a railroad train perform their whole duty under every contingency or on all occasions. The precautions to be adopted and the steps to be taken in aid of safety increase as the danger of accident and injury is increased, and their sufficiency is to be gauged by what is called for by the special circumstances of each case."
Lampkin v. McCormick, 105 La. 418, 29 So. 952, 954, involved a factual situation wherein an individual meeting a train in the City of Shreveport was killed by another train backing from the opposite direction. In reversing a jury verdict in favor of defendant and awarding recovery to plaintiff, the court stated as follows:
"We have declared that, the greater the danger to the public, the greater should be the vigilance exercised and precautions taken to avoid it. If railroad corporations passing through the streets of a city fail to exercise any vigilance and to take any precautions by reason of the pecuniary expense which this would entail, they must be made to know that they assume the risks of resulting accidents, and must take the legal consequences of their balancing the chances."
We find that the pronouncements in the foregoing cases were reaffirmed in Ortolano v. Morgan's L. & T. R. & S. S. Co., 109 La. 902, 33 So. 914, 917, in which the court, in awarding damages for the death of a 5 year old child, stated the duty of a railway company, with respect to obstructions of view at or near crossings, to be as follows:
"We reaffirm the doctrine announced in the Downing and Lampkin Cases as to the duty of railroad employés when approaching danger points. We repeat what was said in the Downing Case that to run a train at a high rate of speed, and without precautionary signals, or with signals manifestly insufficient to meet the requirements of a proper warning of approach, where trainmen have reason to believe that there are persons in exposed positions on the track (as over unguarded crossings in a populous district of a city, or where the public are wont to cross on the track with such frequency and numbers as to be known to those in charge of the train), they will be held to a knowledge of the probable consequences of maintaining great speed without warnings, so as to impute to them reckless indifference in respect thereto, and render their employers responsible for injuries therefrom, notwithstanding there was negligence on the part of the injured, and no fault on the part of the servants after seeing the danger. The doctrine is not based on the idea that they should sooner have observed the danger, however, but on the ground that they knew of its existence, of the presence of people in positions of peril, as a matter of fact, without seeing them at all in the particular instance."
Parents of boys 6 and 10 years of age, respectively, were granted recovery for the death of their children killed by a train while traversing a railroad crossing in a wagon being driven by their grandfather in the Town of Minden. The crossing in question was obscured by the presence of freight cars parked in proximity thereto so as to impede the vision of a person crossing the tracks. In finding the defendant liable, the court in Cherry et ux. v. Louisiana & A. R. Co., 121 La. 471, 46 So. 596, 598, stated as follows:
"By leaving these cars so near the crossing and obstructing the view, defendant *856 increased the danger, and thereby assumed the duty of taking extra precautions for guarding against accidents. Eichorn v. N. O. & C. R. L. & Pr. Co., 112 La. 237, 36 So. 335, 104 Am.St.Rep. 437.
"Defendant not only took no extra precautions, but neglected even the ordinary ones. It ran this locomotive at extra speed and noiselessly on the other side of a train of cars, thereby laying a sort of trap, and gave imperfectly, if at all, even the ordinary signals of bell and whistle.
"One who, on a public highway, approaches a railroad track, and can neither hear nor see any indication of a moving train, is not chargeable with negligence in assuming that there is none sufficiently near to make the crossing dangerous. Tabor v. Mo. Valley R. R. Co., 46 Mo. 353, 2 Am. Rep. 517; Kennayde v. Pac. R. R. Co., 45 Mo. 255. See, also, Correll v. B., C. R. & M. R. R. Co., 38 Iowa 120, 18 Am. Rep. 22, and Pennsylvania R. Co. v. Weber, 76 Pa. 157, 18 Am.Rep. 407; Louisville, etc. R. R. Co. v. Commonwealth, 13 Bush, Ky., 388, 26 Am. Rep. 205."
The rule thus evolved with respect to the degree of extra care required by temporary obstructions such as parked box cars, growing brush and similar non-permanent impediments has likewise been extended and applied to permanent obstructions such as a depot building. See Holstead v. Vicksburg S. & P. Ry. Co., 154 La. 1097, 98 So. 679, 680. On the question of contributory negligence, the court in the Holstead case, supra, used the following language in holding that a motorist was not contributorily negligent in entering upon a side track where a depot was situated in such manner as to completely obstruct the view:
"* * * each case must necessarily depend upon its own facts; but neither this court nor any other is justified, in the absence of statutory provision, in holding that the failure to do any particular act or thing shall amount to contributory negligence or bar recovery, unless it reasonably and logically contributes to the accident. As an illustration, if the plaintiff in this case had reached the crossing a moment sooner, stopped for an instant, instead of slowing down, as he did, pulled upon the track, and been hit, we hardly think it would be said that he could not recover. Yet it may be said that, if he had stopped in this instance, the train might have started before he got upon the rails, and he would not have been hit. However, this would not have been due to the want of negligence, but to the mere sequence of events."
A more recent case dealing with the general subject matter is that of Bergeron v. Greyhound Corporation, La.App., 100 So.2d 923, 926, involving a crossing accident in which defendant bus company was sought to be held liable on the theory the parking of one of its disabled busses in such position as to obscure the view of a motorist crossing a railroad track was the proximate cause of an accident resulting in damage to plaintiff's truck which was struck by a train while negotiating the crossing. In reversing the judgment of the trial court dismissing plaintiff's demand on defendant's exception of no cause of action we stated therein:
"In determining legal responsibility for the present accident, it must be remembered that not only is the conduct of the defendants and of the plaintiff's driver to be considered, but also the conduct of the railroad company. For, as the cases cited by this court in the preceding paragraph indicate, an attempted crossing by a motorist of an obstructed railroad-highway intersection which might ordinarily be deemed negligent may nevertheless not constitute a departure from the standard of ordinary care when attempted under *857 circumstances where a reasonably prudent motorist would not anticipate the presence of a train at the crossing.
"In Cherry v. Louisiana & A. Ry. Co., 121 La. 471, 46 So. 596, 17 L.R.A., N.S., 505, 126 Am.St.Rep. 323, for instance, our Supreme Court held the railroad liable because of excessive speed and deficient signalling in the almost noiseless (due to the competing noise of a planer mill nearby) approach of its train to the very frequented town crossing upon which the accident occurred, the view as to which crossing was obstructed to highway users by railroad cars standing on or near it.
"Likewise, in Holstead v. Vicksburg, S. & P. Ry. Co., 154 La. 1097, 98 So. 679, the court held a motorist not to be contributorily negligent in entering upon a side track (where a depot was situated `in such a manner as to completely obstruct the view in that direction of those traveling on the street from the south until they are practically upon the said side track', 154 La. 1098, 98 So. 680.) when the motorist, having slowed to three miles an hour, made a cautious entry into the crossing and was struck by a train approaching without signals, the sound of the approach of which was further screened by another train moving in another direction.
"In O'Connor v. Chicago, R. I. & P. Ry. Co., La.App. 1 Cir., 40 So.2d 663, the railroad was held liable despite a negligent entrance onto the crossing by the motorist because its employees had the last clear chance to avoid the accident.
"In the Robertson case, above cited, although plaintiff admitted coming upon the tracks unable to see to her side beyond the limited field of her headlights, we stated in reversing the dismissal of her suit upon an exception of no cause of action, 165 So. 530: `Whether the driver of the car in the present case, on being unable to see or hear the approaching train, exercised that care and caution in driving onto the crossing to absolve her from responsibility as contemplated by this rule of the road, is a question of fact for the court or jury to determine on the trial of the case.' Cf., `Whether negligence exists in a particular case must be determined by a consideration of all the attendant or surrounding facts and circumstances,' 65 C.J.S. Negligence § 1a (5) p. 312.
"The famous case of Pokora v. Wabash Ry. Co., 292 U.S. 98, 54 S.Ct. 580, 582, 78 L.Ed. 1149, similarly held that there is no absolute duty upon a motorist `to get out of the vehicle and reconnoitre' before entering a railroad crossing as to which the view is completely obstructed, pointing out that such a sortie is `very likely to be futile, and sometimes even dangerous', 298 U.S. 104, 54 S.Ct. 582. The Court there held that at such a crossing, it was a factual question `whether reasonable caution forbade his (plaintiff's) going forward in reliance on the sense of hearing, unaided by that of sight,' 298 U.S. 101, 54 S.Ct. 581."
Stevens v. Illinois Central R. R. Co., 6 La.App. 165, is confidently relied upon by defendant as controlling the issue presently before this court. The facts in the cited case were quite different from those in the case at bar. By implication the court recognized the "dangerous trap doctrine" but found as a fact that the circumstances complained of did not constitute a trap and rejected plaintiff's demand upon the ground the driver of the automobile involved in the accident was solely responsible for plaintiff's injuries.
After careful consideration of the evidence of record we conclude the crossing in question was dangerous and constituted a "trap" by virtue of the incline of the street, the sharp angle at which the street *858 intersected defendant's railroad tracks and the presence of brush, trees and other growth within defendant's right of way which seriously hampered the view of a motorist traversing same. That the crossing was deemed dangerous was testified to by several witnesses residing within the municipality and who, in the course of their normal activities, were frequently required to negotiate the crossing in question. Moreover, we believe a preponderance of the evidence discloses the existence and presence of grass, brush, trees and shrubs within defendant's right of way sufficient to block the view of a southbound motorist to the extent such a motorist stopping north of defendant's right of way as required by law could not see a sufficient distance to the east to proceed with safety. We further find that because of the aforesaid obstructions a motorist driving southerly would have to proceed to a point of peril upon or dangerously near defendant's tracks before obtaining an unimpeded view of a westbound train an appreciable distance away. In this connection we are particularly impressed with the testimony of Harvey Childers who testified he crossed the track immediately ahead of decedent and neither saw nor heard the approach of the train.
In contending the testimony of plaintiff's witnesses with respect to the condition of the right of way is refuted rather than corroborated by the record, counsel for defendant relies principally upon the testimony of the section foreman James Fowlkes who testified he cut the right of way two days preceding the accident. In this regard defendant's learned counsel also contends certain photographs of the crossing introduced by plaintiffs do not show the true conditions existing on the date of the accident. The aforesaid charge is addressed particularly to that certain photograph taken by Joe Ellzey Minton and marked P-1 for identification. The disputed photograph was taken by Minton on the day of the accident. It was taken from the west side of Centerville Street at a distance of 40 feet north of the tracks, said distance being measured from the spot where Minton stood along the western edge of the street in a southeasterly direction to the railroad track. The photograph was taken from the aforesaid spot with the camera facing southeasterly along Centerville Street. It shows the top of the parked box car appearing above the foliage blocking a motorist's view to the east. The picture graphically illustrates that a motorist stopped 40 feet north of the track (if he did in fact so stop) could not possibly see beyond the box car on the siding and would have a quite limited and restricted view (if any view at all) of a train between the box car and the crossing. On this point, counsel for defendant argues strenuously that the growth shown on the picture in question is not within defendant's right of way but upon adjacent privately owned lands. It is conceded by Minton that the picture in question is an enlargement of a smaller original snapshot but he steadfastly maintained it correctly represented the view of a motorist from the spot where the picture was taken.
The testimony of Fowlkes to the effect that two days prior to the accident he supervised the cutting of the right of way extending 50 feet on either side of the center line of the tracks does not appear to be confirmed by certain photographic evidence in the record. Notably, a photograph marked P-3 for identification, taken August 19, 1958 (four days following the accident), which is a view looking northwesterly across the intersection of Centerville Street from a point on the railroad right of way 70 feet east of the street, shows the presence of weeds and grass growing up to and between the track rails. If the weeds had been cut one week previous thereto as contended by Fowlkes, it is most unlikely they could have attained the height shown therein in such a short span of time. We note also with considerable interest, the further testimony of Fowlkes that he cut the weeds for a distance of only 100 feet each way along the right of way prior to *859 the accident and thereafter he cut the entire right of way between Hatchell Street and Centerville Street. Conceding the veracity of his testimony in this regard, we find the circumstances surrounding this particular crossing required a greater duty with respect to the obstructions shown.
We are also considerably impressed with the testimony of the engineer Edwards who stated that because of the conditions existing at the crossing he could not and did not see the approaching truck until the vehicle was only about 75 feet from the crossing. If he could not see the truck from his position of added height in the cab of the engine by the same token decedent could not have been expected to see the train.
Special note is also made of the testimony of various members of the train crew who readily admitted familiarity with the crossing in question and who likewise conceded the speed of the train was not reduced upon entering the city limits. Assuming the speed of the train to be 30 miles per hour as contended by the crew thereof, we find such speed excessive under the facts and circumstances shown herein.
Pursuant to instructions received from the trial judge, the jury concluded the negligence of defendant's employees was the proximate cause of the accident and that defendant failed to carry the burden of proving contributory negligence on the part of decedent McFarland, both of which determinations are findings of fact.
It is the well settled jurisprudence of this state that the conclusions of the trial court on questions of fact are entitled to great weight and will not be disturbed unless manifestly erroneous. This well established principle has, on numerous occasions been applied to determinations of a jury as well as those of trial judges. Veal v. Audubon Insurance Company, La. App., 144 So.2d 648; Alford v. Lyons, 11 La.App. 670; Rachal v. Texas & Pacific Ry. Co., La.App., 61 So.2d 525; Cush v. Griffith, La.App., 95 So.2d 860; Whitner v. Scott, La.App., 116 So.2d 180.
Finding no manifest error in the verdict of the jury imposing liability upon defendant Illinois Central Railroad Company, said verdict is entitled to affirmance by this court. There remains, however, the question of quantum to be decided.
As previously stated, plaintiffs answered the appeal requesting an increase in the allotments made below whereas defendant's appeal alternatively prays for a reduction in the awards granted.
The evidence shows decedent McFarland was 25 years old on the date of his death. According to the testimony of Forest G. Ray, actuary produced by plaintiffs, said decedent had a full life expectancy of 49.41 years and a working life expectancy of 36 years. According to American Experience Mortality Tables appearing in LSA-R.S. Title 47, Section 2405, said decedent had a life expectancy of 38.81 years. At the time of his death said decedent's income was approximately $400 per month or $4,800 per year.
Learned counsel for plaintiff contends that in determining the award to plaintiff Patsy Lee Kelly McFarland for loss of support we should indulge in a slight modification of the formula employed in Duree v. State La.App., 96 So.2d 854, Stephens v. Natchitoches Parish School Board, 238 La. 388, 110 So.2d 156, and Day v. National U. S. Radiator Corporation, La.App., 117 So.2d 104, pursuant to which an award of $83,500 would be made to said plaintiff herein. Esteemed counsel suggests that using decedent's take home pay of approximately $362.22 per month and multiplying same by his full life expectancy of 49.41 years (as testified to by the actuary Ray) and discounting the sum thus obtained at 2½, the future earnings of decedent would be established at $167,000 of which amount the surviving widow would be entitled to one-half or $83,500.
*860 We are fully aware of our pronouncement in the Day case, supra, to the effect that gross prospective earnings of a decedent, determined by the formula employed in Jones v. Kansas City Southern Ry. Co., 143 La. 307, 78 So. 568 (as refined in the Stephens case, supra, and followed by this court in the Day case, supra), should not be used as the sole and only predicate for an award for loss of support to a wife for the tortious death of her husband. We reiterate that gross prospective earnings as thus computed should be considered along with all other evidence attending each particular case.
Notwithstanding the ingenious attempt of counsel to persuade our deviation from the formula which has been consistently followed in the cases mentioned, we deem it advisable to adhere to the aforesaid formula which calls for a 5% discount factor in computing the present value of a widow's share of her deceased husband's prospective earnings.
The American Experience Mortality Table appearing in our LSA-R.S. 47:2405 (showing full life expectancy only) was compiled some time ago and does not take into consideration recent increase in the average life span resulting from present day scientific and medical discoveries and developments. We are confident (as indicated by the testimony of the actuary Ray who testified in the present case) a revision of the aforementioned mortality table predicated upon current data would reveal a substantial increase in the life expectancies therein shown. Said table, however, does not purport to set forth "working life expectancy".
It is common knowledge, however, that under our present day economy only a few individuals continue to remain gainfully employed throughout their full life expectancy. The social security program inaugurated by our Federal Government, as supplemented by pension and retirement funds and provisions which have come to form an integral part of every employee's total compensation, now assures that virtually every employed citizen may reasonably anticipate retirement while yet possessing several years life expectancy.
In the case before us the testimony of the actuary Ray, shows decedent possessed a "working life expectancy" of 36 years which figure, for the reasons hereinabove set forth, will be used in determining decedent's gross prospective income. Decedent McFarland is shown to have had a "take home pay" of $362.22 per month which we shall also employ herein (considering it reflects his income after deduction of estimated income taxes and considering further the amount to be received by plaintiff widow will be tax free).
Utilizing the figure of $362.22 per month we find decedent had an annual income of $4,346.64 which, projected over a period of 36 years results in a gross prospective income of $146,479.04, of which amount plaintiff widow would be entitled to one-half or $73,239.52. Employing the annual figure of $2,173.32 (one-half decedent's annual "take home pay" of $4,346.64) and using 16.54685171 as the present value of one taken at a discount of 5% for 36 years (See Mathematics of Finance, Second Edition, Thomas Marshall Simpson, Ph. D., Table 6 page 96 of the Appendix of Tables), the value of the widow's claim for loss of support is determined to be $35,961.60. Under such circumstances we fix the award to plaintiff Patsy Lee Kelly McFarland for loss of support in the sum of $35,000.
The next element of damages which must be determined on behalf of the surviving widow is the loss of the love, companionship and affection of decedent. In this connection the testimony of plaintiff is unrefuted to the effect decedent was a devoted husband and father who loved, and, in return, was loved by his wife and children. We believe that all attending circumstances considered, an award to plaintiff *861 widow in the sum of $7,500 will amply compensate her in this regard.
As prayed for in their petition, plaintiffs are entitled to recovery for the pain and suffering endured by decedent in the interval between his injury and death. The evidence shows decedent lived approximately one hour following the accident. There is some evidence to show he suffered intensely at the scene of the accident and on the way to the hospital. There is no evidence of record to indicate the length of time he remained conscious or showing in any detail the medication or treatment prescribed. In view of the limited evidence of record we are disposed to allow an award of $4,500 for decedent's pain and suffering, said amount to be divided equally among the three plaintiffs herein. On this basis plaintiff Patsy Lee Kelly McFarland is entitled to 1/3 thereof or the sum of $1,500.
The evidence discloses that plaintiff widow remarried December 18, 1959. Her marriage, however, can have no effect upon her right of recovery herein and is not to be considered in mitigation or reduction of the damages otherwise due. Stephens v. Natchitoches Parish School Board, 238 La. 388, 110 So.2d 156, Hightower v. Dr. Pepper Bottling Company of Shreveport, La.App., 117 So.2d 642.
In addition to the foregoing awards, plaintiff Patsy Lee Kelly McFarland is entitled to judgment in the sum of $2,422.70, said amount being the aggregate of medical and funeral expense incurred in the treatment of decedent's injuries and his burial following his death.
In determining the award for loss of support to be made to the minors Paul E. McFarland, Jr., and Terry Lee McFarland, we are presently disposed to modify the formula employed in Day v. National U. S. Radiator Corporation, supra, wherein we predicated such loss upon the present Federal Income Tax deduction of $600 per child per year. Upon further reflection we perceive no valid reason why the amount thus determined to be due a child for loss of support should not, as in the case of a widow, also be discounted. In each instance the amount received is immediately forthcoming.
With the foregoing in mind we find that the minor Paul E. McFarland, Jr. was two years old at the time of his father's death and was, therefore, entitled to support for 19 years at $600 per year or gross prospective support of $11,400. Using the annual figure of $600 and 12.08532086 as the present value of one to be taken at a discount of 5% for 19 years (see Mathematics of Finance, supra), the value of said minor's claim for loss of support would be $7,251.19. Under such circumstances we will award said minor Paul E. McFarland, Jr., the sum of $7,200 for loss of support. Terry Lee McFarland was one year old on the date of decedent's demise and was consequently entitled to support for 20 years at $600 per year or total prospective support in the sum of $12,000. Employing the annual figure of $600 and 12.XXXX-XXXX as the present value of one to be taken at a discount of 5% for 20 years (see Mathematics of Finance, supra) the value of said minor's claim for loss of support would be determined to be $7,477.32, in view of which said minor Terry Lee McFarland will be granted the sum of $7,400 for loss of support.
With respect to the age of decedent and the ages of the minors seeking recovery for loss of love, affection and companionship of a deceased father, the case at bar is somewhat similar to that of Day v. National U. S. Radiator Corporation, supra, wherein we awarded each minor the sum of $6,000 for this particular element of damages. We feel a similar award in the present case will do substantial justice between the parties presently before the court.
In addition to the foregoing, each minor is entitled to the sum of $1,500 representing the pro rata share of each in the sum of *862 $4500.00 awarded for pain and suffering endured by decedent.
The awards herein made are recapitulated as follows:

(1) To Plaintiff Patsy Lee Kelly
 McFarland, individually:
 a. Loss of support $35,000.00
 b. Loss of society 7,500.00
 c. Claim of decedent for pain
 and suffering 1,500.00
 d. Medical and funeral expense 2,422.70
 __________
 Total $46,422.70
(2) To plaintiff for the use and benefit
 of the Minor Paul E. McFarland, Jr.
 a. Loss of support $7,200.00
 b. Loss of society 6,000.00
 c. Claim of decedent for pain
 and suffering 1,500.00
 ___________
 Total $14,700.00
(3) To plaintiff for the use and benefit
 of the Minor Terry Lee McFarland
 a. Loss of support $7,400.00
 b. Loss of society 6,000.00
 c. Claim of decedent for pain
 and suffering 1,500.00
 __________
 Total $14,900.00

The judgment of the lower court in favor of Intervenor National Surety Corporation decreeing that said Intervenor be paid by defendant Illinois Central Railroad Company, by preference, all medical and funeral expense as well as all compensation payments paid or to be paid plaintiffs, out of the amounts awarded plaintiffs, was proper and will be affirmed.
From the foregoing it follows the judgment of the lower court must be amended by increasing the amount allotted plaintiff Patsy Lee Kelly McFarland, individually, from $15,000 to $46,422.70, decreasing the amount awarded said plaintiff for the use and benefit of the minor Paul E. McFarland, Jr., from $20,000 to $14,700, and decreasing the amount awarded said plaintiff for the use and benefit of the minor Terry Lee McFarland from $20,000 to $14,900.
The trial court fixed the fee of Forest G. Ray, Actuary, at the sum of $100 and taxed same as costs. We consider the sum allowed reasonable and affirm the judgment of the trial court in this regard.
For the reasons hereinabove assigned, it is ordered, adjudged and decreed that there be judgment herein in favor of plaintiff Patsy Lee Kelly McFarland, and against defendant Illinois Central Railroad Company, individually, in the sum $46,422.70, together with legal interest thereon at the rate of five per cent from date of judicial demand until paid; for the use and benefit of the minor Paul E. McFarland, Jr., in the sum of $14,700, together with legal interest thereon at the rate of five per cent per annum from date of judicial demand, until paid; and for the use and benefit of the minor Terry Lee McFarland in the sum of $14,900, together with legal interest thereon from date of judicial demand until paid. All costs in the trial court and costs of this appeal to be paid by appellant Illinois Central Railroad Company.
Except as herein amended, the judgment of the trial court is affirmed.
Amended and affirmed.